Filed 4/22/13  In re C.G. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.G. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.N., <br><br> Defendant and Appellant. | F065594 <br><br> (Super. Ct. Nos. JD126658 & JD126659) <br><br><br> **OPINION** |

### THE COURT*

APPEAL from a judgment of the Superior Court of Kern County.  Jon E. Stuebbe, Judge.

Marsha F. Levine, under appointment by the Court of Appeal, for Defendant Appellant.

Theresa A. Goldner, County Counsel, Kelley D. Scott, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

*Before Wiseman, Acting P.J., Cornell, J., and Peña, J.

A.N. (mother) appeals from the juvenile court's orders denying her petition to modify the court's previous orders (Welf. & Inst. Code, § 388) and terminating her parental rights (Welf. & Inst. Code, § 366.26).[1] Mother contends: (1) the juvenile court abused its discretion by denying mother's request to reinstate her reunification services for six months, and (2) the court further erred by failing to apply the "beneficial relationship" exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)).

We disagree and affirm the court's order.

### FACTUAL AND PROCEDURAL HISTORIES

When this case began, mother and E.G. III, the presumed father (father), were living together with their two daughters, C.G., born in 2009, and A.G., born in 2011. Mother also has an older daughter, N.L., who was living in the home, but she is not a party in this case. (Mother has two other children; they live with their fathers.)

C.G. and A.G. were placed in protective custody on June 30, 2011. The Kern County Department of Human Services (Department) filed juvenile dependency petitions on the girls' behalf on July 5, 2011. The petitions alleged that mother was arrested on June 29, 2011, for battery on a spouse (father), and C.G. and A.G. were present at the time of the incident. Mother had a history of domestic violence; in March 2010, she agreed to protect her children from domestic violence between herself and father. The home was reported to be filthy and unsafe, and mother was advised to have the home cleaned up. On June 29, 2011, the home was found to be "deplorable, unsanitary and unlivable" for the girls. The next day, the home remained too dirty for the girls to reside in the home. Similar allegations were made against father. In addition, it was alleged that, in March 2011, father tested positive for methamphetamine at a level indicated to be strong, and he had a history of drug abuse dating back to 2003.

---

[1]Subsequent statutory references are to the Welfare and Institutions Code.

At the detention hearing on July 7, 2011, the juvenile court found a prima facie showing that C.G. and A.G. were persons described in section 300 and ordered them removed from the home of parents.

On July 20, 2011, the Department filed amended petitions, adding details to the original allegations. The Department alleged that, during the domestic violence incident of June 29, 2001, mother struck father 15 to 20 times with an open hand and closed fist. On June 16, 29, and 30, 2011, health and safety hazards were found in the home. The girls had access to an unconstructed bedroom and bathroom with nails and unsecured air duct holes in the floor. There was little food in the home, trash and clothes throughout the home, and trash and dirty diapers in the yard. The Department further alleged that the girls were at substantial risk because of mother's mental illness. Mother had been prescribed medication for schizophrenia and bipolar disorder, but she did not take her medication on a regular basis.

The Department prepared a social study for the jurisdictional hearing. It reported that mother had a history with Child Protective Services in Los Angeles County. In 2004, a referral of general neglect was received for N.L. Mother's sister reported that mother had given her temporary custody of N.L. because mother was on drugs. Mother entered a drug rehabilitation center but left before completing the program. According to mother, she had been off drugs for almost a year, and she was discharged from a treatment program because she completed drug counseling and parenting classes. The referral was determined to be unfounded.

In the current case, mother and father submitted to the amended petitions on the basis of the social workers' reports. On August 5, 2011, the juvenile court found the allegations of the amended petitions true. At the hearing on disposition held September 12, 2011, the court adjudged the girls dependent children of the court and placed them in the custody of the Department for suitable home placement. The court found that mother and father made minimal progress toward alleviating the causes for the

3.

girls' removal. The court ordered family reunification services to be provided for the parents for a period of time not to exceed six months. Mother was ordered to participate in counseling for domestic violence as a perpetrator, parenting, and neglect. She was ordered to comply with mental health counseling and medication and to submit to random drug testing. She was to have supervised visitation with the girls twice weekly.

In a social study for the six-month status review hearing, the Department reported that mother refused or failed to test nine times from September 2011 to February 2012. In addition, mother tested positive for amphetamine and methamphetamine in September 2011 and January 2012, the only two times she submitted drug tests. Mother moved to Los Angeles in November 2011 and had not provided the Department any documentation that she was attending counseling for domestic violence, substance abuse, or parenting in Los Angeles. She failed to attend a scheduled appointment with a psychiatrist on February 1, 2012. For these reasons, the Department recommended termination of family reunification services.

At the status review hearing on April 5, 2012, the juvenile court found that mother and father failed to participate regularly and make substantive progress in their court-ordered treatment plans. Since the children were under three years old and there was not a substantial probability they would be returned to the home within six months, the court ordered the termination of reunification services. The court specifically found that mother had made minimal progress toward alleviating the causes of the children's removal and she made minimally acceptable efforts to facilitate the return of the children to her care. A section 366.26 hearing was set for August 2012, and notice was given that the Department recommended terminating parental rights and implementing a plan of adoption.

On July 3, 2012, mother filed a petition under section 388 requesting that the girls be placed with her in a sober living home or, alternatively, that family reunification services be reinstated. Mother asserted that she had been in a sober living home, Shields

4.

for Families, since March 2012 and was actively pursuing all components of her former family reunification plan. She submitted documents showing that she enrolled in Shields for Families on March 13, 2012, she was making good progress in individual therapy, and she regularly attended visits with her daughters. Shields for Families was described as a community-based, multidisciplinary program for high-risk families, providing substance abuse counseling, case management, parenting classes, child development services, mental health, family reunification, and other services. Mother also completed a parent education class and had all negative results for two months of random drug testing.

The Department prepared a social study for the section 366.26 hearing, which was submitted to the court on July 20, 2012. It described some of the supervised visits between mother and the girls. In July and September 2011, mother and father had supervised visits together. On January 6, 2012, mother and the maternal grandmother visited the girls. It was reported, "At all times, both women were patient with the children and attended to their needs …." On January 27, 2012, mother had a two-hour visit with the girls. She requested a visit in the morning so that she could make it to the Greyhound station to go back to Los Angeles. In February 2012, mother asked to change visits to every other week for four hours to accommodate her long travel from Los Angeles County to Kern County, and the change was approved. In a visit on June 1, 2012, mother brought her older daughter to visit with C.G. and A.G. The supervising social worker observed that mother did not seem very engaged during the visit, and the older daughter seemed to have a better bond with C.G. When mother would ask C.G. to do something, C.G. would either do the opposite, say no, or ignore mother completely, but when her older half-sister asked C.G. to do something, she seemed to respond better. Mother appeared to pay more attention to A.G. while the older daughter seemed to do well with both C.G. and A.G. In a visit on June 22, 2012, mother appeared nonexpressive and the girls appeared restless. Mother was appropriate with the children and engaged them in conversation, but she did not smile much. Mother seemed tired, although she did

show affection. In a visit on June 29, 2012, the supervising social worker observed that the visit started off well, but by the end of the visit, everyone was a bit tired. Regarding the mother-child relationship, the Department concluded that, while "the mother appropriately interacts with the girls," "is attentive to their needs," and "[t]he children appear to reciprocate their mother's attention and have an enjoyable time," "[t]here is no indication of a significant bond or attachment between the mother and the children."

The Department recommended terminating parental rights and referring the girls to the county adoption agency. The girls' current caretakers expressed a desire to adopt them. The girls had been living with their prospective adoptive parents for over a year, and the girls called them "mama" and "papa." The Department reported that it appeared "the prospective adoptive parents and the children have bonded together in a primary relationship that should continue."

On August 2, 2012, the Department submitted a supplemental social study to the court addressing mother's section 388 petition. The supplemental study reported that mother had initiated enrollment in her counseling components in October 2011, but she failed to show consistent attendance in her programs or completion of any counseling components until her most recent enrollment in Shields for Families. It was noted that mother often failed to submit to drug testing, and each failed test was recorded as a presumptive positive. When mother did submit to testing, she had three negative results in February and March 2012, and one positive result in March 2012. The Department wrote: "Between September 2011 and April 2012, the mother was ordered to … complete substance abuse counseling. She failed to do so. Further the mother neglected to drug test on a regular and consistent basis. The mother attempted to enroll in several classes to address her court ordered case plan; however, she was not consistent with her participation or diligent with getting enrolled [in] the appropriate programs." Mother has been in the Shields program for only four and a half months, and "has not shown stability at this time."

6.

The Department opined: "[I]t is not in the children's best interest to be removed from their current pre-adoptive placement and placed with the mother. Nor, is it in the best interest of [C.G.] and [A.G.] for the mother to receive Family Reunification Services at this time, as any other plan may only delay the children's permanence. Since the children's dependency[,] the mother had several chances to pursue the issues that led to the children's dependency; however, she did not until recently, eight months later.… [T]he mother's circumstances [have] not changed, but [are] merely changing and the children's best interest would be best served by keeping them in their current placement and pursuing a permanent plan of adoption."

A second supplemental social study submitted on August 17, 2012, included information that mother had all negative drug tests from April to early July 2012. Mother also completed a 12-week parenting class and a course in job development from a vocational services center. The Department continued to recommend that mother's section 388 petition be denied.

On August 21, 2012, the juvenile court held a combined hearing on mother's section 388 petition and the section 366.26 permanency plan hearing. Mother testified in support of her petition. She testified that she was attending domestic violence counseling and anger management, parenting class, and substance abuse counseling. She explained that her residential program generally lasts from 12 to 24 months, depending on the person. Mother had been living there for almost six and a half months and planned to stay for 18 to 24 months. (On cross-examination, she acknowledged she had only been at the program for five and a half months. She also attended weekly individual therapy and was stable on her medications.

Mother recognized that A.G. was only two months old when she was taken away and C.G. was two and a half years old. She testified, "I understand I got a late start, and this time around, I am serious about getting my kids and having my kids and living a full life with my kids." Mother believed it would hurt her children if they were not able to see

7.

her anymore. She told the court that C.G. knows her as "mom," and "for [mother] to be cut out of her life just like that, it would be detrimental to her." Mother testified that A.G. "knows [her] as mom, too." She continued, "[A.G.] probably doesn't understand as much as [C.G.] does, but this is the chance that I want to show the Courts and the Department that I'm willing and I've been making the effort to come see my kids and doing—staying in my program and doing what I need to do to get them back."

Mother's attorney acknowledged that mother only "got serious about what she needed to do" in the last month of her original six-month reunification period, but since then, she has "maintained that seriousness and commitment to doing what's necessary." He argued, "[W]hile it was a late start, the kids, especially [C.G], certainly have a significant relationship with mom, spending the first two and a half years of her life with the mother.… [¶] [A.G.], obviously less so, but you heard from the mother's testimony and you can see from the description of the visitation, that even though [A.G.] has only been seeing mom on a visitation-type basis for most of her life, she still seems to have a close relationship." Mother's attorney asked the court to find it in the children's best interest to give mother six additional months of family reunification services. Father's attorney was in favor of mother's section 388 petition and also argued that father had such a close relationship with the girls that this may be an appropriate case for guardianship. The attorney for the children had no objection to mother's request for six months of reunification services.

After hearing the attorneys' arguments, the juvenile court denied mother's petition. The court explained:

> "This is one of those cases where … it does appear that there's some evidence that the mother has finally pulled it together, is headed in the right direction. The question is whether or not at this stage of the proceeding and after this long out of her care, the children's need of stability and permanency in their life outweighs any evidence that I have before me, that, in fact, she has started heading in the right direction.

8.

"So it's a difficult balancing kind of a decision to make. They are very young children, especially [A.G.]. The decision, of course, is easier. As to [C.G.], it's a little more difficult because she's older and has more contact with the mother, but she also … was very young at the time she was taken from the home.

"I think at this point the children's need for stability is—outweighs the need of the parent. I don't think that the relationship between them is so strong as to outweigh the children's need for that, so I will deny the 388 petition."

The court proceeded to the section 366.26 hearing. It rejected father's request for guardianship and accepted the Department's recommendations. Finding clear and convincing evidence that the children were likely to be adopted, the court terminated the parental rights of mother and father and referred C.G. and A.G. to the county adoption agency for adoptive placement.

Mother filed a notice of appeal the next day.

### *DISCUSSION*

## I. *Section 388 petition*

Any parent or other interested party may petition the juvenile court to modify or set aside a prior dependency order pursuant to section 388 on grounds of changed circumstance or new evidence. (§ 388, subd. (a)(1).) The party bringing a section 388 petition has the burden to prove that the proposed change is in the best interests of the child. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

After the termination of family reunification services, a parent's interest in the care, custody, and companionship of her children is no longer paramount. "Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) A court deciding a section 388 petition "at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Ibid.*)

9.

Further, "[a] petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)

We review a juvenile court's decision on a section 388 petition for an abuse of discretion. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*Id.* at pp. 318-319.)

Mother contends the denial of her section 388 petition was an abuse of discretion. She asserts the court failed to make the appropriate determination, that is, whether it was in the children's best interests to grant mother's request to place the children with her or provide her with an additional six months of reunification services. Instead, she argues, it appears the court prematurely applied the test for determining whether the beneficial-relationship exception to termination of parental rights was applicable. We are not persuaded.

In denying mother's petition, the court explained, "The question is whether or not at this stage of the proceeding and after this long out of her care, the children's need of stability and permanency in their life outweighs any evidence that I have before me, that, in fact, [mother] has started heading in the right direction." Mother's position appears to be that it was incorrect for the court to refer to "stability and permanency" rather than "best interest" in deciding the section 388 petition. Stability and permanency, however, are primary considerations in determining a child's best interest. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re Marilyn H.* (1993) 5 Cal.4th 295, 310 [after termination of reunification services, it is presumed that continued care is in best interest of child].)

10.

Consequently, it was appropriate for the court to consider the girls' stability and permanency in deciding mother's section 388 petition.

Mother also relies on *In re Kimberly F.* (1997) 56 Cal.App.4th 519 (*Kimberly F.*), in which the court identified three principle factors relevant to the juvenile court's evaluation of best interests in the context of a section 388 petition: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Id.* at p. 532.)

The facts of this case are easily distinguishable from the facts of *Kimberly F.* First, in *Kimberly F.*, the court concluded that the reason for the dependency—a dirty home—"was not as serious as other, more typical reasons for dependency jurisdiction, such as … illegal drug use .…" (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 522.) Here, in contrast, the reasons for dependency included father's drug use and mother's domestic violence, and mother does not dispute that she has a substance abuse problem. Second, in *Kimberly F.*, the petitioning mother demonstrated an undisputedly strong bond with her children and also had a substantial amount of unmonitored visitation. (*Id.* at p. 532.) In this case, the Department reported "no indication of a significant bond or attachment between the mother and the children," while "the prospective adoptive parents and the children have bonded together in a primary relationship .…" Further, mother did not have substantial or unmonitored visitation, seeing her girls in supervised visitation only every other week. Third, in *Kimberly F.*, the unsanitary conditions that led to removal had been eliminated, and the appellate court rejected the juvenile court's other rationale for denying the mother's section 388 motion—the mother's alleged "narcissistic" personality. (*Id.* at p. 533 [observing this was description of human personality, not mental illness].) Here, mother does not claim that the problems that led to dependency have been eliminated; she argues only that she is headed in the right direction.

11.

Mother was given notice that failure to cooperate or avail herself of services could result in the termination of services after only six months. Yet, she failed to complete her case plan components within six months, failed to submit to drug tests, and tested positive for drugs in September 2011, January 2012, and March 2012. There was evidence that C.G. and A.G. were bonded with their caregivers, whom they called "mama" and "papa," as well as evidence that mother and the girls did not share a significant bond. At the time the court heard her section 388 petition, mother was addressing her problems but may not have been ready to assume custody of her daughters. Under these circumstances, we cannot say the juvenile court abused its discretion in denying her section 388 petition. (See *In re Casey D.*, *supra*, 70 Cal.App.4th at pp. 43, 48-49 [no abuse of discretion in denying petition where mother was in drug treatment and had been drug free for about five months; mother's circumstances "were changing, rather than changed"].)

## II. *"Beneficial relationship" exception to termination of parental rights*

Mother also contends that the juvenile court erred in failing to apply the "beneficial relationship" exception to termination of parental rights. (See § 366.26, subd. (c)(1)(B)(i).) We disagree.

The purpose of a section 366.26 hearing is to select and implement a permanent plan for the dependent child. (*In re S.B.* (2009) 46 Cal.4th 529, 532.) The Legislature's preferred permanent plan is adoption. (*In re D.M.* (2012) 205 Cal.App.4th 283, 290.) "At a section 366.26 hearing, the court must terminate parental rights and free the child for adoption if [1] it determines by clear and convincing evidence the child is adoptable within a reasonable time, and [2] the parents have not shown that termination of parental rights would be detrimental to the child under any of the statutory exceptions to adoption found in section 366.26, subdivision (c)(1)(B)(i) through (vi). (§ 366.26, subd. (c)(1).)" (*Id*. at p. 290.)

In this case, mother does not dispute that C.G. and A.G. are adoptable. She contends only that the beneficial parent-child-relationship exception applies. (§ 366.26,

12.

subd. (c)(1)(B)(i).)  To avoid termination of parental rights under the beneficial-relationship exception, the juvenile court must find "a compelling reason for determining that termination would be detrimental to the child" due to the circumstances that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid.*)  It is the parent's burden to prove that the exception applies.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574 (*Autumn. H.*).)

The beneficial-relationship exception requires a finding that the parent-child "relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  "[T]he court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

The beneficial-relationship exception requires the parent to show more than frequent and loving contact or pleasant visits.  (*In re C.F.* (2011) 193 Cal.App.4th 549, 555; *In re C.B.* (2010) 190 Cal.App.4th 102, 126; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527.)  "The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.]  Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated.  [Citation.]" (*In re C.F.*, *supra*, at p. 555.)

We review the court's ruling under the abuse of discretion standard.  This means that we review the court's findings of fact for substantial evidence and its conclusions of law de novo, and we reverse its application of law to facts only if it is arbitrary and capricious.  (*In re C.B.*, *supra*, 190 Cal.App.4th at p. 123.)

13.

Mother argues that the court erred in failing to apply the beneficial-relationship exception in this case. She asserts that, "[b]ecause mother visited the children regularly and consistently, because she and the children shared a bond, and because the impact upon the children of the juvenile court's decision to remove her from their lives forever is unknown, it cannot be said that adoption *substantially* outweighs the benefit to the children of maintaining their relationship with mother." After termination of reunification services, however, the law does not require the juvenile court to find that the benefits of adoption *substantially* outweigh the benefit of continuing the parental relationship in order to terminate parental rights. To the contrary, it was mother's burden to show "a substantial, positive emotional attachment" sufficient to overcome the preference for adoption. (*Autumn H*., *supra*, 27 Cal.App.4th at p. 575.)

Further, since mother had the burden of proof at trial, "the question for a reviewing court becomes whether the evidence compels a finding in favor of [mother] as a matter of law." (*In re I.W., supra,* 180 Cal.App.4th at p. 1528.) The issue is whether mother's evidence was uncontradicted, unimpeached, and of such weight as to leave no room for a judicial determination that it was insufficient to support the finding. (*Ibid*.) Here, there was evidence from the Department's social studies that there was no significant attachment between mother and the girls. In response, mother offered no evidence, other than her own opinion, that the girls would be harmed if her parental rights were terminated. On the record before us, we cannot say that the record compels a finding that preserving the girls' relationship with mother outweighs the benefits of adoption. In other words, the juvenile court did not abuse its discretion by not applying the beneficial-relationship exception in this case.

## *DISPOSITION*

The juvenile court order is affirmed.